IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT MCCAMMOND** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 6589 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert McCammond ("Plaintiff" or "McCammond") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). Administrative Law Judge ("ALJ") Melissa Olivero denied Plaintiff's application for disability insurance benefits and a period of disability in a February 15, 2013 written decision. McCammond appealed the ALJ's ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. McCammond challenges the ALJ's decision by claiming that she incorrectly assessed his credibility and erred at Step 5.[1] For the reasons outlined below, the Court construes the Step 5 claim as

---

[1] In his rely brief Plaintiff appears to challenge the ALJ's RFC assessment and her findings concerning examining expert Dr. Edward Goldberg's medical report. Not having been raised in the opening brief, however, these issues cannot be asserted for the first time in a reply. It is well established that arguments and legal theories initially raised in a reply brief are waived. "The reason for this rule of waiver is that a reply brief containing new theories deprives the respondent of an opportunity to brief those new issues." *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998). *See also Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010); *Murphy v. Village of Hoffman Estates*, 1999 WL 160305, at * 2 (N.D. Ill. March 17, 1999) ("Raising an argument generally in a motion [ ] does not give a litigant license to be vague in his original submissions and provide the necessary detail in his reply."). This rule applies to appellate briefs, motions for summary judgment, and discovery motions. *See Med. Assur. Co., Inc. v. Miller*, 2010 WL 2710607, at *3-4

one that concerns the credibility assessment.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are

---

(N.D. Ind. July 7, 2010).

Plaintiff's motion also purports to be governed by the standard of Fed. R. Civ. P. 56. Indeed, McCammond has submitted the Statement of Undisputed Facts required by LR 56.1. That is improper. Rule 56 has no application to an appeal from a final decision by the Commissioner. Plaintiff's counsel is directed to remedy such oversights in any subsequent filing with this Court.

described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

B. **Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408,

413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Discussion

The Court does not review the medical record in detail. In short, Plaintiff alleges that he is disabled due to a degenerative spine disorder, diabetes, kidney problems, high blood pressure, and the after-effects of a mild hemiparetic stroke. Applying the familiar five-step disability analysis, ALJ Olivero found at Step 1 that McCammond had not engaged in substantial gainful activity since his alleged onset date of March 13, 2009. His severe impairments at Step 2 were diabetes, chronic kidney disease, late effects of a cerebrovascular accident, degenerative disc disease of the lumbar and cervical spine, and a history of alcohol abuse. None of these impairments met or medically equaled a listing at Step 3 either singly or in combination. Before moving to Step 4, the ALJ found that McCammond's statements concerning the severity and frequency of his symptoms were not fully credible. She assessed his RFC at sedentary work, though McCammond could lift up to 20 pounds occasionally and 10 pounds frequently. The ALJ then found at Step 4 that Plaintiff could not perform his past relevant work. Relying on the testimony of a

4

vocational expert ("VE"), the ALJ concluded that jobs existed in the national economy that McCammond could perform. She therefore found that he was not disabled.

At the time that Plaintiff filed his motion, the Social Security Administration ("SSA") directed adjudicators to consider a claimant's symptoms, at least in part, by evaluating the credibility of the claimant's statements concerning the severity and persistence of his or her symptoms. That analysis was governed by the guidelines set out in SSR 96-7p. However, the SSA has recently updated its guidance about how to evaluate symptoms in disability claims by issuing SSR 16-3p. The new Ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "clarify that subjective symptoms evaluation is not an examination of the individual's character." SSR 16-3p. Though the new Ruling post-dates the ALJ hearing and decision in this case, the application of a new Ruling to matters on appeal is appropriate where the new regulation or Ruling is a clarification of existing law rather than a change to it. *Pope v. Shalala*, 998 F.2d 473, 482-83 (7th Cir. 1993). In determining whether a new rule constitutes a clarification or a change, courts give great weight to the stated "intent and interpretation of the promulgating agency." *Id*. at 483. Though a statement of intent is not dispositive, courts defer to an agency's expressed intent to clarify a regulation "unless the prior interpretation . . . is patently inconsistent with the later one." *Id*.; *see also First Nat. Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 479 (7th Cir. 1999).

The new Ruling specifies that its elimination of the term "credibility" in symptoms evaluation is intended to "clarify" its application of existing rules and to "more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p. Moreover, SSR 96-7p and SSR 16-3p are not patently inconsistent with one another. A comparison of the two

5

Rulings shows substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms. It is therefore appropriate to evaluate the ALJ's analysis of McCammond's subjective complaints in light of the new guidance the SSA has provided.

Whether the issue is considered under SSR 96-7p or SSR 16-3p, ALJ Olivera's analysis was erroneous. She considered multiple aspects of McCammond's statements concerning his symptoms that stemmed from his severe kidney disease, back pain, stroke, and other impairments. Some of what she stated is clearly correct. Plaintiff claimed, for example, that he experienced frequent dizzy spells. The ALJ countered that allegation by noting that only one record showed that McCammond presented at a hospital emergency room complaining of dizziness. She reasonably concluded that did not support his claim of "frequent" episodes.

That said, most of what the ALJ discussed (and certainly Plaintiff's primary set of claims) concerned McCammond's back pain. The ALJ began her credibility discussion by casting broad doubt on Plaintiff's reliability based on his denial in August 2010 that he had "an alcohol problem." (R. 28). Generally speaking, an ALJ is entitled to note discrepancies in a claimant's statements concerning his condition or treatment when evaluating his symptoms. SSR 16-3p states that "[i]n determining whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner, we will consider the consistency of the individual's own statements." SSR 16-3p. In this case Plaintiff arrived at the St. Joseph Medical Center on August 31, 2010 complaining of "excruciating low back pain." (R. 419). The attending physician noted that his blood

alcohol level was 0.237, even though Plaintiff claimed that he did not drink every day and never drank significant amounts of alcohol. The doctor's note states that Plaintiff's wife had earlier contradicted both claims when speaking with the attending nurse. (*Id.*).

The Court disagrees that the August 2010 treatment note provides a basis for impugning McCammond's descriptions of his symptoms. It is undisputed that Plaintiff had problems with alcohol; the ALJ found at Step 2 that alcohol abuse was a severe impairment. But she also stated that it was immaterial to the disability analysis because it had no effect on Plaintiff's symptoms. (R. 28). That makes it difficult to understand why the ALJ cited (one) statement about alcohol use to question the many other statements about pain and other symptoms that she herself found were unrelated to alcohol. The only reasonable interpretation of the ALJ's unexplained analysis of this issue is that she thought that, if Plaintiff lied about one thing, then he was less reliable in what he said concerning something else. (R. 28, stating that "claimant's credibility is . . . an issue in this case" because he denied alcohol abuse). That amounts to an attack on McCammond's character, not a reasoned explanation of why he exaggerated his back pain. That might have been permissible under SSR 96-7p had the ALJ drawn some form of logical bridge between the record and her conclusion.[2] However, SSR 16-3p was issued to eliminate just such an attack on a claimant. Its opening paragraph instructs ALJs that "subjective

---

[2] Not only did she fail to do so, the ALJ did not consider the context in which Plaintiff's statement was made. McCammond's fleeting comment was made in an emergency room visit precipitated by severe pain. The stresses placed on Plaintiff by his pain and the ER setting make the ALJ's reliance on McCammond's comment exceptionally weak. Perhaps he was frightened by the circumstances, or too embarrassed to admit his drinking to a doctor he did not know. At a minimum, the ALJ should have questioned McCammond on the topic before using his statement against him.

symptom evaluation is not an examination of an individual's character." SSR 16-3p. It is for that reason that the SSA has eliminated the term "credibility" from the analysis of a claimant's symptoms. Thus the ALJ was unjustified in citing Plaintiff's denial of alcohol abuse to draw any conclusions about his other symptoms.

The ALJ continued her analysis by finding that McCammond was not fully believable because he had only received "routine and conservative treatment" for his back pain. (R. 28). Plaintiff suffered a serious fall in 2005 from a second-story window. MRI exams in 2006 and 2008 of Plaintiff's spine showed that he suffered from degenerative disc disease of the L2-L3 through L5-S1 vertebrae, together with annular tears at L3-L4 and L4-L5. (R. 502). Later exams showed a positive discogram at L4-L5 and S1. McCammond received a number of epidural injections for his back and neck pain. Such injections are frequently characterized as conservative. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 875 (7th Cir. 2014) (noting that such injections are conservative treatment that an ALJ may rely on) (citing *Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir. 2000)). Insofar as it went, therefore, the ALJ did not err by viewing Plaintiff's epidurals as being at odds with a claim that Plaintiff's pain was so severe that it rendered him unable to work.

Unfortunately, the ALJ failed to explain how she could sweep the complete medical record under the rug of "conservative care." Plaintiff's treatment was not limited to epidural injections. He also underwent a posterior spinal fusion and posterior lumbar fusion, a complete L5 laminectomy, and a left L5-S1 diskectomy in March 2011.[3] The ALJ's

---

[3] A spinal fusion "is surgery to permanently join together two or more bones in the spine so there is no movement between them." https://www.nlm.nih.gov/medlineplus/ency/article.htm. A laminectomy "is surgery that creates space by removing the lamina – the back part of the vertebra that covers [the]

conclusion that these serious procedures were nothing more than "routine and conservative" care is, frankly, baffling. *See Thomas v. Colvin*, 534 Fed.Appx. 546, 551(7th Cir. 2013) (stating that equating spine surgery with conservative care is "nonsensical"). Common sense suggests that such invasive surgical procedures differ from epidural injections by an order of magnitude. If the ALJ thought that Plaintiff's surgery did not support McCammond's claims, then she should have explained what it was about these serious interventions that led her to that conclusion. It makes no sense to dismiss a laminectory and spinal fusion as nothing more than "conservative" treatment that called Plaintiff's allegations into question. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (finding that a spinal implant was not conservative treatment).

Even if Plaintiff had not had the fusion and laminectomy, ALJ Olivera's treatment of McCammond's back pain would still fall short of an adequate analysis of the pain issue. Plaintiff had several epidural injections in his spine. The ALJ thought that they were so effective that McCammond's pain levels decreased by 75% at his follow-up exams. (R. 26). That was wrong. The record shows that the pain-reducing effects of the epidurals quickly wore off by the time of his follow-up exams. For example, Plaintiff received an injection on April 6, 2009. He reported a 75% reduction in pain when the procedure was complete. (R. 618). McCammond did *not* report a 75% decrease on his May 6 follow-up. On the contrary, Dr. Udit Patel noted that the injection had "provided him not as good relief as in the past. At this point, the [injections] are not as effective as they used to be." (R. 620). The same was true when McCammond was given another injection on November

---

spinal canal." http://www.mayoclinic.org/tests-procedures/laminectomy/basics/definition.

17. He again reported a 75% reduction in pain on that date. But Dr. Patel stated with evident concern on December 29 that not only had Plaintiff not received the ususal relief, "[a]t this point, his pain may be too much for repeated [injections]." (R. 636). Thus not only did the injections only provide temporary relief, they became increasingly ineffective in controlling Plaintiff's pain at all. That is at odds with the ALJ's assumption that Plaintiff experienced ongoing pain relief that was easily reduplicated every time he had an injection.

Equally concerning is the ALJ's failure to note that the epidural injections were not intended to be the full range of Plaintiff's treatment for back pain. Dr. Patel's notes indicate that Plaintiff had been undergoing consultations with a specialist about his back pain even while he was being given injections. The May 6, 2009 entry observes that Plaintiff was going to see "an independent doctor" about his back pain but was prevented from doing so by a scheduling conflict. (R. 822). The December 29, 2009 note states that Plaintiff had seen a Dr. Bernstein who thought that McCammond "would likely need surgery." (R. 636). As stated above, Plaintiff eventually underwent surgery. Yet despite the fact that his condition was painful enough in 2009 to warrant what appears to have been serious discussions about surgery, the ALJ dismissed Plaintiff's pain allegations based on the erroneous belief that McCammond's epidurals treated his pain with relative ease.

The ALJ also doubted Plaintiff's descriptions of his pain because the record did not show that he had received any medical treatment after December 2011. (R. 28). The problem with that reasoning is that the ALJ never asked Plaintiff to explain why his medical records stopped at the end of 2011. SSR 96-7p, which governed the ALJ's analysis at the time, made the issue at hand very clear: an ALJ should ordinarily not draw an adverse credibility inference because of lack of treatment unless the ALJ first seeks an explanation

from the claimant.  SSR 16-3p continues that directive in modified form.  It states that "[w]e will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  SSR 16-3p.

The ALJ seems to have thought that, since Plaintiff stopped (or seems to have stopped) seeking treatment at the end of 2011, his symptoms must not have been as serious as he claimed.  That might have some traction if the record permitted an inference that Plaintiff's condition in 2011 was not particularly serious, or that he did not need ongoing care. But the record strongly suggests otherwise.  One of the last treatment notes dated July 6, 2011 shows that McCammond continued to experience significant pain.  In fact, he had increased pain at that time.  ("R. 878, "He is in *more* pain. . . .") (emphasis added).  Dr. Patel treated it with significant doses of pain medication, including gabapentin and Norco.  Indeed, McCammond had been receiving prescription pain medication for years.  The ALJ never considered why a claimant who had taken such long-term doses of pain medications would suddenly stop pursuing treatment six months after the July 2011 note indicated that his pain had increased.  It is at least as reasonable to guess (and that is what the ALJ did) that something prevented McCammond from continuing treatment as it is to conclude that his condition was not really as serious as he claimed.

The ALJ's failure to investigate the issue is even more troubling based on the last medical record concerning McCammond's chronic kidney disease.  On December 30, 2011, Plaintiff had a nephrology consultation with Dr. Beata Kisiel.  She noted that he suffered from Stage 3 chronic kidney disease with underlying FSGS (focal segmental

11

glomeruloscloerosis), diabetic nephropathy, and acute anemia.[4] (R. 892). The ALJ's only account of this record was to state that Plaintiff's condition was "stable." (R. 27). That illuminates nothing about the seriousness of his condition. *See Hemminger v Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008) ("[A] person can have a condition that is both 'stable" and disabling at the same time."). The ALJ should have recognized that Dr. Kisiel's note raised a critical question about the medical record: why would an individual with a rare and chronic Stage 3 kidney disorder that could lead to renal failure suddenly stop seeing all of his physicians, including his treating nephrologist? Even if his pain levels were not so serious as to require ongoing medical management, the record strongly suggests that his kidney disease did. That required at least some minimal investigation of the topic at the hearing. Maybe there was a valid reason why no medical records exist after December 2011. Or maybe the ALJ was right after all. The reality is that no one knows because the ALJ did not comply with her obligation under SSR 96-7p and/or SSR 16-3p. That was erroneous.

The ALJ tried to bolster her analysis by citing Plaintiff's activities of daily living ("ADLs"). She noted that he could make a frozen dinner and sandwiches; clean the counter top once a week, go outdoors twice a week; and talk to family and friends. The ALJ characterized these activities as "extensive" and used them to discount the seriousness of Plaintiff's symptoms. (R. 29). That makes no sense. The Seventh Circuit has repeatedly instructed ALJs that ADLs cannot be equated with work abilities in the easy

---

[4] "FSGS is a rare disease that attacks the kidney's filtering units (glomeruli) causing serious scarring which leads to permanent kidney damage and even failure." http://nephcure.org/livingwithkidneydisease/understanding-glomular-disease/understandings-fsgs.

12

manner that the ALJ used in this case. *See*, *e.g.*, *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (warning that ALJs must consider "the differences between household and labor-market work"). It is entirely unclear what reasoning ALJ Olivera used to find that McCammond could work full time because he can clean a countertop once a week, go outside twice a week, put a frozen dinner in the microwave, or talk to friends. Full-time work would require Plaintiff to go outside *every* day. Even sedentary work would force McCammond to do more than put a frozen dinner in a microwave or clean the countertop once a week. He would have to exert himself for eight hours at a stretch, five days a week. The ALJ provided no reason why the astonishingly limited ADLs that she cited could be construed to support her finding that he could work full time. That was, after all, the crucial issue that she was supposed to address. *See Forsythe v. Colvin*, 813 F.3d 677, 679-80 (7th Cir. 2016) ("The [ALJ] seemed not to understand that the question [s]he had to answer was . . . whether [Plaintiff] was . . . able to hold down a 40-hour-a-week job outside the home."). The ALJ was not obligated to believe what McCammond stated about his ADLs. However, she could not merely cite what Plaintiff said he could do, characterize his activities as "extensive," and end the analysis. That fails to build any bridge at all between the record and the ALJ's conclusion.

She did refer in general terms to the medical record for support. But like 96-7p, SSR 16-3p does not permit such an inference from the record, at least standing alone and unsupported by some reasonable explanation. "[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p. The limitations of the ALJ's

13

approach can be illustrated by examining Plaintiff's allegation that he experiences numbness and limitations in his hands. The ALJ dismissed that claim by noting that he also said that he could button his shirt and pick up coins. That was unwarranted. It is true that Plaintiff told the ALJ that he could pick up small items and button his shirt. But he also said that repeated use of his right hand – as would be required if he worked full time – caused numbness, poor gripping, and soreness. Even lifting a glass of water throughout the day could irritate his hand. (R. 82-83). The record supports Plaintiff's allegations. Dr. Peter Analytis found in December 2010 that Plaintiff was experiencing difficulty in using his right upper extremity due to pain and weakness. He had numbness throughout the right arm as a result of his mild stroke. (R. 908). Dr. Kisiel noted the next month that he had "residual right hemiparesis" (weakness) due to the stroke that created "difficulty with opposition on the right hand." (R. 912). Dr. Kristopher McDonough noted "weakness and numbness . . . bilateral arms/hand" in November 2010. (R. 917). Neurologist Dr. Shaik Nazaeerulla found a "gradual onset of upper and lower extremity numbness and weakness" the same month. (R. 935). ALJ Olivera failed to take notice of any of these entries. Without doing so, and by not accounting for the full scope of what Plaintiff said about his right-hand limitations, the ALJ had no ground for dismissing his statements concerning his right hand merely because he could pick up a coin and button a shirt.

### III. Conclusion

For all the reasons discussed above, Plaintiff Robert McCammond's Motion for Summary Judgment [18] is granted. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

On remand, the ALJ shall explain more clearly the reasons that support her analysis (now using SSR 16-3p), including an assessment of McCammond's claim that he must sit or lie down throughout the day to relieve his pain. If the ALJ continues to believe that McCammond is not disabled, she shall explain why he is able to work five days a week for eight hours a day. Given that no consulting or examining expert issued an RFC assessment that directly supported her own RFC of sedentary work (and no medical expert appeared at the hearing), the ALJ shall also explain more fully the specific reasons that support her RFC finding. *See* SSR 96-8p ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence (e.g., daily activities, observations)).

ENTER:

_____
Daniel G. Martin
United States Magistrate Judge

DATE: July 5, 2016.